**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

JOHN DOE,
    C/O ENGEL AND MARTIN
    5181 NATORP BLVD., SUITE 210
    MASON, OH  45040

Plaintiff,

v.

THE COLLEGE OF WOOSTER,
    1189 BEALL AVE,
    WOOSTER, OH 44691

and

JANE ROE
    c/o THE COLLEGE OF WOOSTER,
    1189 BEALL AVE,
    WOOSTER, OH 44691

Defendant

Case No. 5:16-cv-00979-SL

Judge Sara Lioi

AMENDED COMPLAINT

AND

JURY DEMAND

1

## INTRODUCTION

1. Plaintiff John Doe brings this action for a declaratory judgment and breach of contract and other related claims.

2. This case arises out of the decision of The College of Wooster (the "College") to impose disciplinary sanctions against John Doe in violation of the Plaintiff's contractual rights.

## PARTIES

3. Plaintiff John Doe ("Doe") is a student at the College.

   a. John Doe is a California resident with a residence at [OMITTED].  His driver's license and voter registration is from California. He has been living in Ohio for the sole purpose of attending college, but considers himself a California resident. Doe has completed three semesters of coursework at the College.

   b. John Doe has paid a significant amount of money to the College in the expectation of receiving an education and, if he successfully completes his classwork, a degree.

4. Defendant the College is a private university.

   a. The College has approximately 1,400 full-time students.  The College is a private liberal arts college primarily known for its emphasis on mentored undergraduate research.

   b. The College has a principal place of business at1189 Beall Ave, Wooster, OH 44691

   c. The College voluntarily participates in federal spending programs.

5. Defendant Jane Roe (the "Complainant") is a student at the College.

   a. On information and belief, Jane Roe is a Minnesota resident with a permanent residence at [OMITTED].

   b. On information and belief, Jane Roe is currently residing at the College.

2

6. The disclosure of John Doe's or Jane Roe's identity will cause the students irreparable harm as this case involves matters of the utmost personal intimacy, including education records protected from disclosure by the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g; 34 CFR Part 99.

## JURISDICTION AND VENUE

7. This case is between citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.  Accordingly, this Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1332.

8. The injunctive relief sought in this matter is authorized by 28 U.S.C. §§ 2201 and 2202 and Federal Rules of Civil Procedure 57 and 65.

9. This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. § 1391.  The defendant is a resident of the State in which this district is located and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTS

**THE COLLEGE OF WOOSTER'S RESPONSE TO THE ISSUE OF SEXUAL MISCONDUCT ON CAMPUSES**

10. After years of criticism for being too lax on campus sexual assault, colleges and universities are relying on Title IX to crackdown on alleged perpetrators.  Unfortunately, this crackdown has gone too far.  Problems include: accused students effectively are presumed guilty; instead of requiring accusers to prove they were assaulted, the accused students have to prove they had consent; and schools apply the very lowest standard of proof — preponderance of the evidence.

11. On April 11, 2011, the U.S. Education Department's Office of Civil Rights sent a "Dear Colleague" to colleges and universities.

a. The Dear Colleague Letter indicated that, in order to comply with Title IX, colleges and Universities must have transparent, prompt procedures to investigate and resolve complaints of sexual misconduct.

b. Most notably, the Dear Colleague Letter required schools to adopt a relatively low burden of proof—"more likely than not"—in cases involving sexual misconduct, including assault. Several colleges had been using "clear and convincing," and some, like Stanford, applied the criminal standard, "beyond a reasonable doubt."

c. The Dear Colleague Letter states that schools should "minimize the burden on the complainant," transferring alleged perpetrators, if necessary, away from shared courses or housing.

d. The Dear Colleague Letter, while not completely ignoring due process concerns, suggested that schools should focus more on victim advocacy.

e. The Dear Colleague Letter states that schools should give both parties the right to appeal a decision, which amounts to double jeopardy for an accused student.

f. After the Dear Colleague Letter was published, many schools changed their sexual assault and sexual harassment policies and procedures.

12. The Federal Government, through the Department of Education, Office of Civil Rights, has been pressuring colleges and universities to aggressively pursue investigations of sexual assaults on campuses.

a. The Dear Colleague letter was a step in the increased enforcement of Title IX on college and universities. NPR described the Dear Colleague Letter as the government's "first warning shot."  Source:  *How Campus Sexual Assaults Came To Command New Attention*, NPR, August 12, 2014.

b.  The Washington Post reported in March 2015 that the Office of Civil Rights was seeking to hire up to 200 more investigators.

c.  In May 2014, the federal Department of Education disclosed for the first time the names of colleges — 55 in all, including Hobart and William Smith — under investigation for possibly violating federal rules aimed at stopping sexual harassment.

d.  The Federal government is investigating at least 129 schools for possible Title IX violations, including notable schools such as UC Berkeley, Stanford, Harvard, Brown University, Columbia University, Cornell University, Dartmouth College, Johns Hopkins University, the University of Chicago and many top state universities.  The Department has negotiated settlements with many schools, including Ohio State.

e.  In February 2014, Catherine E. Lhamon, the assistant secretary of education who heads the department's Office for Civil Rights, told college officials attending a conference at the University of Virginia that schools need to make "radical" change.  According to the Chronicle of Higher Education, college presidents suggested afterward that there were "crisp marching orders from Washington."  Source: *Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases*, Chronicle of Higher Education, February 11, 2014.

f.  Lhanon was quoted in the LA Times **stating**, "We don't treat rape and sexual assault as seriously as we should, . . . [There is] a need to push the country forward."  David G. Savage and Timothy M. Phelps,  *How a little-known education office has forced far-reaching changes to campus sex assault investigations,* LA Times August 17, 2015.

13. Schools, including the College, are scared of being investigated or sanctioned by the Department of Education.

a.  The Federal government has created a significant amount of pressure on colleges and universities to treat all those accused of sexual misconduct with a presumption of guilt.

5

The Chronicle of Higher Education noted that "Colleges face increasing pressure from survivors and the federal government to improve the campus climate." Source: *Presumed Guilty: College men accused of rape say the scales are tipped against them,* Chronicle of Higher Education, September 1, 2014. In the same article, the Chronicle noted that different standards were applied to men and women: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent."

b. Lhamon told a national conference at Dartmouth in the summer of 2014, "I will go to enforcement, and I am prepared to withhold federal funds." Source: *How Campus Sexual Assaults Came To Command New Attention*, NPR, August 12, 2014. In that same article, Anne Neal of the American Council of Trustees and Alumni was quoted as follows: "There is a certain hysteria in the air on this topic, . . . It's really a surreal situation, I think." She explained that schools are running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of defendants instead.

c. In June 2014, Lhannon told a Senate Committee, "This Administration is committed to using all its tools to ensure that all schools comply with Title IX . . ." She further told the Committee:

> If OCR cannot secure voluntary compliance from the recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the DOJ to file a lawsuit against the school. To revoke federal funds—the ultimate penalty—is a powerful tool because institutions receive billions of dollars a year from the federal government for student financial aid, academic resources and many other functions of higher education. OCR has not had to impose this severe penalty on any institution recently

> because our enforcement has consistently resulted in institutions agreeing to take the steps necessary to come into compliance and ensure that students can learn in safe, nondiscriminatory environments.

    d. Robert Dana, dean of students at the University of Maine, told NPR that some rush to judgment is inevitable. "I expect that that can't help but be true," he says. "Colleges and universities are getting very jittery about it."  Source:  *Some Accused Of Sexual Assault On Campus Say System Works Against Them*, NPR, September 3, 2014.

14. On April 19, 2014, the College adopted a Policy on "Equal Opportunity, Harassment and Non-Discrimination."  (The "Equal Opportunity Policy." A copy of the Equal Opportunity Policy is attached as Exhibit A.)

    a. On information and belief, the Equal Opportunity Policy was adopted in direct response to the pressure from the Department of Education.

    b. The Equal Opportunity Policy states, "The College of Wooster considers Non-Consensual Sexual Intercourse violations to be the most serious and, therefore, typically imposes the most severe sanctions, including suspension or expulsion for students and termination for employees."

    c. The Equal Opportunity Policy defines "Non-Consensual Sexual Intercourse" as any sexual penetration or intercourse (anal, oral, or vaginal), however slight, with any object, by a person upon another person, that is without consent and/or by force.  The Equal Opportunity Policy further provides, "Sexual penetration includes vaginal or anal penetration by a penis, tongue, finger, or object, or oral copulation by mouth to genital contact or genital to mouth contact."

    d. The Equal Opportunity Policy defines "Non-Consensual Sexual Contact" as any intentional sexual touching, however slight, with any object, by a person upon another person, that is without consent and/or by force.  The Equal Opportunity Policy further

provides, "Sexual touching includes any bodily contact with the breasts, groin, genitals, mouth, or other bodily orifice of another individual, or any other bodily contact in a sexual manner."

e.  The Equal Opportunity Policy defines "consent" as "knowing, voluntary, and clear permission by word or action, to engage in mutually agreed upon sexual activity. Since individuals may experience the same interaction in different ways, it is the responsibility of each party to make certain that the other has consented before engaging in the activity. For consent to be valid there must be a clear expression in words or actions that the other individual consented to that specific sexual conduct."

f.  The Equal Opportunity Policy provides that alleged victims may receive benefits, known as "accommodations."  These accommodations are not available to students who do not claim to be victims of sexual assault and, but for the claim that the student is a victim of sexual assault, would not have been provided.  Most importantly, the accommodations are provided upon a complaint, not upon any determination that a sexual assault has actually occurred.

    i.  The accommodations provide a significant incentive for alleged victims to possibly fabricate or exaggerate claims of sexual assault.

    ii.  The receipt of accommodations may have a significant effect on the credibility of an alleged victim.

    iii.  The Equal Opportunity Policy provides, "The College of Wooster will implement initial remedial and responsive and/or protective actions upon notice of alleged harassment, retaliation, and/or discrimination whether or not charges are pending through the College's judicial system and/or the state judicial system; persons who make a complaint (complainants) and those against whom a

8

complaint is filed (respondents) are entitled to the same remedial actions. Such actions could include but are not limited to: no contact orders, providing counseling and/or medical services, academic support, living arrangement adjustments, providing a campus escort, academic or work schedule and assignment accommodations, safety planning, and/or referral to campus and community support resources."

15. On October 1, 2014, the College began operating under a new sexual assault policy fashioned after the "One Policy, One Process" model policy the College received courtesy of the Association of Title IX Administrators.

   a. The Association of Title IX Administrators is an organization established by a for-profit consulting and law firm.  The Association members generally do not have significant law enforcement investigatory experience.

   b. Secretary of the College and Title IX Coordinator Angela Johnston stated that the new policy was implemented following the Department of Education's changes to the standards of Title IX with regards to sex discrimination.

   c. The new policy eliminates any possibility of students hearing cases involving sexual assault.  Johnston stated, that a key feature of the new policy was to "take adjudication of student sexual assault cases out of the student judicial process so students do not hear cases involving the sexual assault of their peers."

16. Violations of the Equal Opportunity Policy are adjudicated at the College under the terms of the College's Handbook.

   a. The College's Handbook is a contract between the students, including John Doe, and the College.

b.  The College's Handbook is known as the "Scot's Keys."  (The 2015-2016 Version of the Scot's Keys is attached hereto as Exhibit B.)

17. Violations of the Equal Opportunity Policy are adjudicated under the College's Judicial System, pursuant to the Scot's Key.

a.  The Equal Opportunity Policy is included as part of the Scot's Key.

b.  The Scot's Key provides that the Judicial System "is designed to address infractions of the Codes of Social Responsibility and Academic Integrity and policies of the College.* The College's Judicial System should not be confused with the state and federal criminal justice systems.

c.  The College's Judicial System is intended to be educational rather than punitive.  The Scot's Key also suggests, "when an individual believes a crime has been committed, it is recommended that charges be filed in the criminal justice system since the College's Judicial System cannot assess penalties that are sufficient to punish crimes."

18. The Scot's Key provides that although the Judicial System is "informally structured," it is designed to "meet a standard of 'essential fairness.'"

a.  Included in the concept of "essential fairness" is the following:  the accused will be presented with the charges against him or her in writing; the accused has the opportunity to a hearing where he/she may confront the accuser; the accused has the opportunity to defend himself/herself against the charge(s) and to present witnesses to assist in that process; witnesses must be individuals with direct knowledge of the incident or its impact; and the accused is presumed innocent, and it is the responsibility of the accuser to prove guilt.

b.  In describing the hearing procedures, the concept of "essential fairness" is again emphasized.  The Scot's Key provides, "The hearing body's proceedings will be

conducted in a fair and just manner and will meet the basic requirements of essential fairness without becoming unduly legalistic."

19. The College employs an outside attorney to conduct an investigation into alleged violations of the Equal Opportunity Policy.  The outside attorney employed by the College does not have any or significant law enforcement investigative experience.

**THE FALL 2014 INCIDENT**

20. John Doe was expelled from the College for events that allegedly occurred beginning on the evening of November 1, 2014 (the "Incident")

21. John Doe was good friends with the Complainant at the College (the "Complainant.")

    a.  John Doe and the Complainant shard mutual interests and seemed to have an intellectual and physical attraction.  The Complainant had opened up to John Doe about her past fears and struggles with depression.  She read to him poetry and short stories she had written.

    b.  John Doe and the Complainant had engaged in sexual contact in the past.  However, they never had sexual intercourse.

    c.  When it became apparent that the two would not be in a long-term relationship, John Doe and the Complainant drifted apart.  However, the Complainant would attempt to make John Doe jealous by discussing with John Doe her sexual activities with other men.

    d.  The Complainant has claimed that she and John Doe were not on good terms even though she also said that she and John Doe never argued.

22. The Complainant engaged in threatening and stalking behavior towards John Doe.  She would stare at John Doe and give him strange looks.  A few days before the incident that led to this

case, the Complainant gave John Doe a birthday present – a writer's journal with a small quote from Sylvia Plath.

23. On the evening of the Incident the Complainant was drinking with a number of her friends in a dorm at the College.  She then went to a couple of parties, including a party at the OATS House. The Complainant normally takes medication for depression and anxiety; she had not taken her medication prior to the Incident.

24. OATS is an unrecognized off-campus fraternity at the College.  John Doe is a member of OATS now, but was not a member of OATS at the time of the Incident.

25. The Complainant saw John Doe at the OATS party but the two did not talk.  On the evening of November 1, 2014 (a Saturday), the Complainant was drinking and attended a series of parties. She met John Doe at an off campus party.

26. At about 2:00 in the morning, John Doe called the Complainant.  He requested her help getting into the dorm because he had lost his access card.

27. The Complainant invited John Doe to enter her room.  She said that he could sleep in her room.

28. The Complainant and John Doe removed their clothing (remaining in their underwear) and started kissing on the Complainant's bed.  John Doe asked the Complainant twice if she wanted to have sex; she said no but continued to kiss John Doe.

29. John Doe got out of the bed and started to leave the room.  The Complainant wanted John Doe to stay and cuddle with her.  The two started to argue, in part because John Doe did not want that type of relationship. The Complainant got very upset during the argument.  John Doe left the room.

30. John Doe did not have sexual intercourse with the Complainant on the day of the Incident.  He has never had sexual intercourse with the Complainant.

31. The Complainant did not report an alleged rape to the police.

32. John Doe saw the Complainant at OATS on at least two more occasions.  On one occasion, she came upstairs at the house to smoke marijuana with John Doe and others; she threatened to have Doe kicked out of school on this occasion for his use of marijuana and living off campus (in violation of College rules).

**THE DISCIPLINARY PROCEEDINGS AGAINST JOHN DOE**

33. On May 12, 2015 – more than six months after the Incident – the Complainant filed a "Report of Discriminatory Harassment/Sexual Misconduct" with the College.

   a.  This Report contained the wrong date of the Incident.  This Report stated that the Incident had occurred on October 31, 2014 instead of November 1, 2014.

   b.  The Complainant stated that she "had been a friend of [John Doe's] for a few months, along with some intimacy."  This is technically correct, but understates the nature of the relationship.

   c.  This Report did not state that John Doe had intercourse with the Complainant.  She wrote, "As he tried to remove his clothes, along with mine, I was able to mule kick him off of me.  He then yelled in my face, shook me, and left the room."

   d.  This Report did not list several possible witnesses, such as M.C. and J.D., who the Complainant would later claim learned of the alleged rape.

   e.  This Report allegedly attached a copy of a photograph from a few weeks before the Incident.  The photograph allegedly showed hickeys given to the Complainant by John Doe.  The Complainant wrote, "I believe this shows [John Doe's] aggressive nature."

   f.  The Report contained false and defamatory information about John Doe, specifically the false allegation that he had engaged in conduct which could be considered to be a criminal sex offense under Ohio law.

34. On May 13, 2015, the Complainant's Report was reviewed by Johnston in her role as the Title IX Coordinator for the College. The College did not take any immediate actions to investigate the allegations; instead, Johnston simply emailed other administrators to see if there were any prior reports about the students involved.

35. On May 20, 2015, Johnston emailed the Complainant and asked for a meeting.  The Complainant responded that she was studying abroad but would "touch base" with Johnston when she returned on June 3, 2015.

36. During the summer recess of 2015 the Complainant did not meet with or communicate with Johnston.

37. During the summer of 2015, John Doe did not meet with or communicate with anyone at the College about the Incident.  He was not aware that a Report had been submitted.

38. During the summer of 2015, the College took no steps to investigate this allegation.  Nobody at the College attempted to gather evidence or interview witnesses. Nobody at the College sought to meet with or call the Complainant.  Nobody at the College sought to meet with or call John Doe.

39. On August 5, 2015, Johnston emailed the Complainant to ask for a meeting.  The Complainant told Johnston tat she would consider meeting with her when she returned to campus.

    a. The Complainant indicated that she had not done well in her first year the College.  She said, "My first year was horrible . . ."  The Complainant also expressed concerns about reporting:  "I know of many cases at Wooster that have been reported and the backlash was horrible.:

    b. Johnston seemed to promise a benefit to the Complainant if she pursued a complaint against John Doe.  She responded, "I'm sorry you didn't have a good first year; I'll do what I can to help you get off to a good start this year."

14

40. Between August 5, 2015 and November 2015, the College took no steps to investigate this allegation.  Nobody at the College attempted to gather evidence or interview witnesses. Nobody at the College sought to meet with or call the Complainant.  Nobody at the College sought to meet with or call John Doe.

41. The Complainant was supposed to meet with Johnston on or about November 19, 2015.  The Complainant did not appear for this meeting.  The College took no other steps to investigate this allegation.

42. The Complainant was supposed to meet with Johnston on or about December 1, 2015.  The Complainant did not appear for this meeting.  The College took no other steps to investigate this allegation.

43. On or about December 2, 2015, on information and belief, the Complainant met with Johnston. At this meeting, the Complainant changed her story and told Johnston that she had been raped by John Doe (i.e. that John Doe had compelled her to have intercourse by force).

44. The Complainant's December 2, 2015 statement to Johnston contained false and defamatory information about John Doe, specifically the false allegation that he had engaged in conduct which could be considered to be a criminal sex offense under Ohio law.

45. On December 6, 2015 the Complainant emailed Johnston.

   a. The Complainant said, "I hate to say that I do not trust the College of Wooster with issues like this because far too many have been swept under the rug . . ."

   b. The Complainant indicated that she was not going to pursue the matter any further.  She said, "Thank you for meeting with me and listening to my story.  I really do appreciate the guidance you gave me.  If I decide to pursue this further I will look outside the school for help."

   c. Johnston responded with a request to meet again

      i. Johnson acknowledged that in her initial report, the Complainant "did not indicate that a rape had occurred."  However, instead of seeing this as a reason to doubt the veracity of the Complainant, Johnston said the new allegation "heightens the concern" about John Doe.

      ii. Johnston indicated that she wanted to take actions to remove the "perception out there in the student body" about the College's handling of sexual assault allegations.

46. On or about December 15, 2015 Johnston and the Complainant met again.  On information and belief, at this meeting Johnston encouraged and convinced the Complainant to pursue the matter against John Doe.

47. On December 17, 2015, Johnson requested to meet with John Doe.  She did not disclose that an allegation had been made against John Doe.  She said, "I have a matter of significant importance to discuss with you."

48. On December 18, 2015, Johnston informed John Doe by email, "a female student has filed a complaint of sexual misconduct against you."  Johnston did not provide any details of the allegation to John Doe or even the identity of his accuser, even though he specifically asked, "Is there anything else you could tell me about the case."  This obfuscation was intentional; Johnston later told the Complainant that she "did not identify the reason" to John Doe.

49. In contrast to the formal emails to John Doe, Johnston was sympathetic and familiar with the Complainant.   For example, on December 22, 2015 she wrote to the Complainant, "I wanted to let you know that [John Doe] and I talked over the phone."

50. On December 20, 2015, John Doe was informed by Johnston that the College had received a complaint that he had violated the Equal Opportunity Policy

a. The College waited more than seven months before informing John Doe that a complaint had been made, even though the College had received the Report (which identified John Doe by name) on May 12, 2015.

b. Johnston did not disclose the nature of the allegations, the date of the alleged violation, or when the College had received the complaint.

c. On December 22, 2015, Johnston sent a letter to John Doe confirming the December 20, 2015 conversation.  This letter stated that the College would conduct and investigation and that "The investigation is based on a civil rights model designed to provide a fair, thorough and impartial process."

51. The College started an investigation on or about December 22, 2015.  As a result, any investigation occurred more than one year after the Incident.  The delay in starting an investigation, both from the date of the Incident and the date when the College received the report, impacted the ability of John Doe to obtain witnesses and other evidence that could have assisted in his defense.

52. The College retained Katie Clifford, an attorney, legal education consultant and partner with Schuster & Clifford, LLP in Columbus, Ohio, and an affiliated consultant with the National Center for Higher Education Risk Management to conduct an investigation.

a. Clifford had previously expressed views suggesting that she was biased.  She told a sorority,  "There is a large percentage of underreporting by victims of sexual assault, less than 5 percent [of victims]."  Available at: https://www.alphachiomega.org/getmedia/018dc05e-fb77-4cea-924c-d5dd3d7af278/Fall-2014-On-Campus-Feature.pdf;.aspx/

17

    b. Clifford, on information and belief, has no real experience in the investigation of allegations of sexual assault.  Clifford has never conducted such investigations as a law enforcement officer or a prosecutor.

53. Clifford began her investigation on or about January 19, 2016.  The investigation was completed on February 10, 2016.

54. Clifford interviewed the Complainant on January 19, 2016.  During this interview, the Complainant told a very different story about the Incident.

    a. The Complainant alleged that John Doe had started kissing her and that she kept pushing John Doe away.  The Complainant alleged that John Doe had pushed her down on the bed and proceeded to get on top of her.  The Complainant alleged that John Doe held her down on the bed and forceably penetrated her vagina with his penis.

    b. The Complainant alleged that immediately after the incident she told a male friend, J.U., what had happened. The Complainant alleged that the next day she told a female friend, M.C., that she had been raped.

    c. The alleged that she had texted John Doe the day after the Incident but did not receive a response.

    d. The Complainant stated that John Doe had not previously exhibited anger or aggressive behavior.

    e. Clifford interviewed the Complainant on at least two more occasions.

    f. The Complainant's statement to Clifford contained false and defamatory information about John Doe, specifically the false allegation that he had engaged in conduct which could be considered to be a criminal sex offense under Ohio law.

55. John Doe met with Clifford on January 20, 2016

    a.  John Doe was at a significant disadvantage because of the amount of time that had elapsed since the November 2014 Incident.

    b.  John Does was not, at this time even aware of the nature of the allegations.  He asked, for example, "I'm not sure of the charges.  Are we talking penis in vagina?"  When he first heard the exact nature of the charges, he was so shocked that he had to excuse himself to throw up in the bathroom.

    c.  John Doe was accompanied by his mother (his mother is not an attorney). Clifford invited her into the room, but Johnston sought to prevent John Doe from having the advice and counsel of a parent.  She said to John Doe, "You sure you want your mother to hear this?"

    d.  Unlike her decision to re-interview the Complainant, Clifford conducted only one interview with John Doe.

56. Clifford interviewed a number of witnesses suggested by the Complainant and John Doe

    a.  J.D. told Clifford that the Complainant alleged she had been raped.  She also said that the Complainant would sometimes joke about John Doe and having sex with him.

    b.  M.C. told Clifford that the Complainant alleged that she had been raped.  M.C. stated that she told the Complainant to report the incident, but that the Complainant declined.  She also noted that the Complainant did not seem emotionally distraught.

    c.  J.U. told Clifford that the Complainant alleged she had been raped.  J.U. used to date the Complainant.  J.U. slept in the Complainant's bed on the night of the Incident.

    d.  H.H. told Clifford that the Complainant had threatened to have John Doe kicked out of school for drug offenses and living off campus.  The Complainant did not tell Clifford of the details of the alleged rape.

   e.  Clifford interviewed a number of witnesses suggested by John Doe.  None of these witnesses had first hand knowledge of the events between John Doe and the Complainant.  In addition, Clifford confused dates and events, which caused the witnesses to provide confusing and incorrect statements.

57. Clifford's investigation fell below the standard for a full, complete and competent investigation in a number of ways:

   a.  Clifford did not record any of the interviews she conducted.

   b.  Clifford interviewed the Complainant on the same day that she started the investigation. Clifford, as a result, did not have any time or opportunity to review physical evidence or conduct any investigation prior to the interview.

   c.  Clifford provided witnesses, including the Complainant and the Respondent, with the opportunity to review and revise their statements.  This gave the complainant an opportunity to revise her statement to fit the alleged facts, rather than using the facts to challenge the credibility of the complainant.

   d.  Clifford failed to adequately investigate the Complainant's motive for coming forward with the rape allegation so long after the incident.

      i.  Clifford failed to inquire about the accommodations received by the complainant.  These accommodations may have had a significant effect on the credibility of the complainant and provided a motive for the delayed report.

      ii. Clifford did not ask why the Complainant cancelled a number of meeting with Johnson and expressed unwillingness to pursue this matter.  Clifford also did not ask what Johnston said to the Complainant to change her mind.

    iii.  Clifford failed to obtain any documentation to support the Complainant's claim that she was having increased anxiety and medical issues since she reported the alleged rape.

    iv.  Clifford was told by H.H. that the Complainant had seen a counselor for this incident.  Clifford did not follow-up with the Complainant about why this information was not disclosed, and did not seek the records from the Counselor.

    v.  Clifford failed to inquire why the Complainant did not disclose some witnesses who claimed to have heard about an alleged rape from the Complainant shortly after the Incident in her original May 2015 Report.

e.  Clifford was told by John Doe that the Complainant had previously threatened to have him kicked out of school.  The Complainant initially denied this.  She then admitted to making an angry statement to John Doe, but denied some of the content. Clifford did not follow-up or seek to interview other potential witnesses to this threat.

f.  Clifford was told by John Doe that the Complainant had previously punched him and other people in the face.  The Complainant initially denied this and then changed her story and admitted to punching men in a joking manner. Clifford did not follow-up or seek to interview potential witnesses to this threatening conduct.

g.  Clifford did not challenge the conflicting stores provided by the Complainant.

    i.  The Complainant told Clifford that she was afraid to come forward initially with the whole story because it could ruin the relationship with a mutual friend. However, Clifford never interviewed this mutual friend.

    ii.  The Complainant told Clifford that she feared retaliation for reporting. However, Clifford never followed-up to determine if this was a credible fear.

h. Clifford was told by the Complainant that she takes medication for anxiety and depression.  However, Clifford never consulted a physician or other expert who could have determined whether this medication would affect the Complainant ability to accurately recollect events.  This failure is particularly important because the Complainant admitted to drinking and/or failing to take her medications, which could also have affected her ability to accurately recall events.

i. Clifford was biased in favor of alleged victims and, as a result, the Complainant.

58. John Does was not aware of the exact nature of the charges against him until he received a copy of the investigative report on February 19, 2016.  He was given only one week to prepare for his disciplinary hearing

59. On March 2, 2016, the College conducted a hearing ostensibly to determine if John Doe had violated the Equal Opportunity Policy.  John Doe was found "guilty" at the hearing.

a. During the hearing the Complainant provided false and defamatory information about John Doe, specifically the false allegation that he had engaged in conduct which could be considered to be a criminal sex offense under Ohio law.

b. The conduct of entire process treated John Does as if he was guilty from the start and did not permit him a full and fair opportunity to defend himself.

i. Dean Buxton gave hand signals to John Doe, such as "time out" signs, that served to disrupt his testimony.  These signals were clearly visible to the panel members but would not appear on any tape or transcripts of the hearing.  She also visibly rolled her eyes while John Doe attempted to make his statement.

ii. When John Doe entered the room, no members of the Hearing Panel would look him in the eye.

22

      iii.  One member of the Hearing Panel appeared to be openly hostile to John Doe, at one point even raising her voice towards him.  She also asked irrelevant questions focusing on details that would be hard to remember after a significant period of time.  She asked, for example, "What did the cups look like, how many drinks of beer did you have and how many drinks of hard alcohol."

c.  John Doe was prohibited from presenting relevant evidence that would undermine the credibility of the Complainant, including:

      i.  John Doe could not present evidence of the Complainant's character, including her previous drug use, suicide attempts, and pattern of false statements.

      ii.  John Doe could not present a witness who had heard the Complainant threaten John Doe.

      iii.  John Doe could not present character witnesses, even though the report provided to the Hearing Panel included character-type statements about the Complainant.

d.  The College did not permit John Doe to be represented by Counsel.

e.  There was no physical evidence or witness to support the allegations that John Doe was guilty.  The only witness presented against John Doe was the Complainant.

      i.  This witness could not be relied upon by any reasonable finder of fact, as the Complainant significantly changed her story on a number of occasions.

      ii.  This witness could not be relied upon by any reasonable finder of fact as she had a history of mental health problems, had stalked John Doe, and had previously threatened John Doe.

iii. This witness could not be relied upon by any reasonable finder of fact because much of her testimony was contradicted by other witnesses, including the testimony that John Doe had acted in a drunk and belligerent manner.

60. On information and belief, the College, from the outset, presumed that John Doe was guilty in order to look good for the Department of Education.

a. The College was heavily invested in protecting female accusers even when there is no evidence of wrongdoing by males in order to avoid scrutiny from the Department of Education.   This is illustrated by the persistence of the College in pursuing the investigation of the Incident even though the complainant changed her story multiple times and seemed to be reluctant.

b. On information and belief, the College imposed sanctions on John Doe because it was afraid of an investigation from the Department of Education and/or a Title IX lawsuit from the complainant.

i. A student advisor at the College who has significant experience in these matters has told John Doe's counsel that the College has a history of NOT charging people in these types of complaints.   John Doe and another student charged the same week were first to her knowledge.  She indicated that the College has been concerned that the if Department of Education requested case files, they "would . . .. have not been happy."

ii. John Doe's student advisor has told John Doe's counsel that her impressions was that John Doe had to prove his innocence as opposed to "innocent until proved guilty."  She also indicated that some recent policy changes made it more difficult for students to defend themselves.

61. The Defendants' continued actions against John Doe are causing substantial, immediate, and continuing damages. Expulsion from The College would cause John Doe to be denied the benefits of education at his chosen school, would damage his academic and professional reputations, and may affect his ability to enroll at other institutions of higher education and to pursue a career.

### COUNT I
### (BREACH OF CONTRACT)

62. Plaintiff repeats and incorporates all the allegations of this Complaint, as if fully set forth herein.

63. This Count is asserted against the College.

64. By enrolling at the College, and paying his tuition and fees, and attending the school, John Doe and the College had a relationship that may reasonably be construed as being contractual in nature.'

65. The terms of the contract between Doe and the College are generally found in various College policies and procedures, including those set forth in the student handbook, the Scot's Keys.

66. The contract between John Doe and the College required the college to provide John Doe with an adjudicatory process that was "essentially fair."

67. The contract between John Doe and the College contains an implied covenant of good faith and fair dealing.  This implied covenant prohibits the College from doing anything which will have the effect of destroying or injuring the right of John Doe to receive the fruits of the contract.

68. John Doe paid the College tuition and fees for the 2015-2016 year.

69. The College repeatedly and materially breached the explicit guarantee of essential fairness and as well as the implied covenant of good faith and fair dealing and other contractual provisions. These breaches include, but are not limited to, the following:

   a. The College breached the explicit and implied obligation to enforce a requirement that complaints of misconduct must be asserted within 30 days of an incident.

25

    i.  Page 49 of the Scot's Key provides:

        1.  "Any member of the campus community may file charges against any student for misconduct by filing a written charge with the Chairperson of the Judicial Board or a member of the Residence Hall staff and/or the Dean of Students staff within thirty (30) days following an incident."

        2.  "In addition, a member of the Residence Hall staff or the Dean of Students staff may file a written charge of suspected violation of the code or College policy with the Chairperson of the Board within thirty (30) days after first having knowledge of an incident."

    ii.  The Complaint in this case was made significantly beyond the 30 days required under the Scot's Keys.

        1.  The incident occurred on November 1, 2014. The alleged misconduct was first reported by the Complainant on May 12, 2015.

        2.  At the latest, the College was aware of the alleged misconduct when reported by the Complainant on May 12, 2015. The College did not conduct a timely investigation and did not file a written charge until after the completion of the investigation in February 2016.

    iii.  The failure to enforce the 30 day rule was a breach of the guarantees of fundamental fairness, the explicit language in the Scot's Keys, and the implied covenant of good faith and fair dealing.

b.  The College breached the explicit and implied obligation to present to John Doe with written notice of the charges against him.

    i.  Page 48 of the Scot's Keys provides:  "The accused will be presented with the charges against him or her in writing."   While this notice was eventually

26

provided, it was not provided in a timely manner.  Despite an allegation being made against John Doe in May 2015, the College did not provide notice of the alleged misconduct by John Doe until February 2016.

   ii.  The failure to provide timely notice of the charges was a breach of the guarantees of fundamental fairness, and the implied covenant of good faith and fair dealing.

c.  The College breached the implied obligation to perform a threshold evaluation of the allegations before starting an investigation.

   i.  This threshold evaluation is necessary to avoid imposing an undue burden upon the accused.

   ii.  Had the College performed a reasonable threshold inquiry, this matter would not have been investigated any further.  This is because:

      1.  The allegation against John Doe was made beyond the 30 days limit of the Scot's Key.

      2.  The allegation that John Doe and the Complainant engaged in sexual intercourse was not made until months later.  Prior to this, the Complainant had made a number of statements describing the investigation that explicitly denied that they had sexual intercourse.  A reasonable threshold inquiry would have determined that, as a result of the changing stories, the Complainant had not stated a credible allegation of a violation of the Equal Opportunity Policy.

   iii.  The failure to conduct a reasonable threshold inquiry was a breach of the guarantees of fundamental fairness, and the implied covenant of good faith and fair dealing.

d. The College breached the explicit and implied obligation to conduct a full and fair investigation of the claims against John Doe.

    i. The College's breach of its obligations to conduct the required investigation began when the Complainant filed a complaint on May 12, 2015.  However, the College's investigator, Clifford, did not conduct any investigative activity until January 19, 2016.  (John Doe was offered only a Skype interview over Winter Break.)

    ii. Clifford has previously expressed a bias in favor of alleged victims of sexual assault.

    iii. Clifford was not an experienced or trained investigator into allegations of what essentially was a criminal sexual assault.  The use of Clifford was unreasonable because the College had available, better, alternatives:

        1. The College employs a number of trained and experienced law enforcement officers in its police department.  The College could have referred the matter to these officers for an investigation.

        2. The College could have referred the matter to the Wooster Police or the Wayne County Sheriff's Office.  On information and belief, both of these offices have specially trained officers with experience in investigating allegations of sexual assault.  The College could have referred the matter to these officers for an investigation.

    iv. The failure to conduct a full and fair investigation was a breach of the guarantee of fundamental fairness, and the implied covenant of good faith and fair dealing.

e. The College breached the explicit and implied obligation to act reasonably in setting a hearing date and resolving the allegations.

      i.   The Department of Education has suggested that all investigations into claims of sexual assault should be completed, when possible, within 60 days.  This includes the entire investigatory, adjudicatory, and appeal process.

     ii.   The initial report of misconduct was made on May 12, 2015.  The hearing occurred on March 4, 2016 and the entire process against John Doe was not completed until March 18, 2016.

   iii.   The decision to hold a hearing almost sixteen months after the date of the incident and ten months after the initial report was a breach of the guarantees of due fundamental fairness, and the implied covenant of good faith and fair dealing.

f.   The College was required to conduct a full and fair hearing before an unbiased hearing panel.  This is significant because the hearing panel received copies of the investigative report.

      i.   The Scot's Key (p. 56) provided John Doe with the opportunity to question those who provide testimony to the Hearing Panel   Yet, the report contained hearsay and, as a result, permitted witness to provide information to the Hearing Panel without being subject to cross-examination.   This is a breach of the contractual guarantee of cross-examination.

     ii.   The bias and mistakes inherent in the investigative report tainted the fairness of the hearing panel.

g.   The conduct of entire process treated John Does as if he was guilty from the start, thereby tainting the hearing process.  Although the Scot's Key specifically suggests that John Doe is presumed to be innocent, this is not how he was treated.

29

i. Johnston acted from the beginning as someone who "believed" the Complainant without conducting any investigation.

ii. John Doe was prohibited from presenting relevant evidence that would undermine the credibility of the Complainant, including the accommodations received by the Complainant and the steps taken by Johnston to encourage her to make a report.

iii. The bias of the entire process was so pervasive throughout the pre-hearing and hearing processes that it destroyed any possibility of fairness and ensured that John would be found guilty.  The finding was plainly a product of the presumption of guilt, as well as the atmosphere of bias and hysteria that permeated the entire disciplinary process.

iv. The failure to conduct an unbiased hearing was a breach of the guarantees of fundamental fairness, and the implied covenant of good faith and fair dealing.

h. The College breached its express and implied obligations when it did not permit John Doe to be represented by Counsel.

i. Although the Scot's Keys states that attorneys cannot be present, this contractual provision is inconsistent with the express and implied guarantees of fundamental fairness.  The notion of a young man being able to defend himself competently in this intensely emotional situation is absurd. An accused student in this situation is bound to be intimidated – as John Doe was – and cannot be expected to prepare and deliver his version of the facts in a coherent and logical manner. John should not have been

ii. The failure to allow John Doe to have counsel was a breach of the guarantees of fundamental fairness, and the implied covenant of good faith and fair dealing.

30

    i.   The College breached its express and implied obligations when it found John Doe Responsible without sufficient evidence.

        i.   The Scot's Key includes the express statement that a student be found "guilty" by the preponderance of the evidence.

        ii.   There was no physical evidence or witness to support the allegations that John Doe was guilty.

        iii.   The only witness presented against John Doe was the Complainant, who was not a witness a reasonably prudent fact-finder would rely upon.

        iv.   The failure to require that John Doe be found guilty only on the basis of sufficient evidence was a breach of the guarantees of fundamental fairness, conviction by a preponderance of the evidence, the presumption of innocence, and the implied covenant of good faith and fair dealing.

70. As a direct and foreseeable result of the University's failure to honor its express and implied contractual promises and representations, John Doe has sustained, and will continue to sustain, substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

**COUNT II**
**(PROMISSORY ESTOPPEL)**

71. Plaintiff repeats and incorporates all the allegations of this Complaint, as if fully set forth herein.

72. This Count is asserted against the College.

73. As described above, the Scot's Keys and other official College publications constitute promises and representations that the College intended to induce reliance on the part of John Doe. In reasonable reliance, John accepted the College's offer of admission and incurred the cost of tuition and related expenses based on the College's representations that it would honor its

express and implied promises, including the guarantees of fundamental fairness, and the implied covenant of good faith and fair dealing.

74. John Doe relied to his detriment on these express and implied promises and representations made by the College.

75. Injustice can only be avoided by enforcement of the College's promises and representations.

76. As a direct and foreseeable result of the University's failure to honor its promises and representations, John Doe has sustained, and will continue to sustain, substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

**COUNT III**
**(NEGLIGENCE)**

77. Plaintiff repeats and incorporates all the allegations of this Complaint, as if fully set forth herein.

78. This Count is asserted against the College.

79. Having put in place a student disciplinary process, the College owed a duty of care to John Doe and others to conduct that process in a non-negligent manner and with due care. The College officials who directed and implemented that process owed John Doe the same duty of care.  The College is responsible for the conduct of those acting on its behalf under the theory of *respondet superior*.

80. The obligation of the College included to obligation to conduct an investigation and adjudicatory process in a non-negligent manner.

81. The conduct of the College in conducting an investigation fell below the applicable standard of care and amounted to breaches of the duty of due care.  This negligent conduct included, but was not limited to:

a.  The investigator retained by the College had insufficient experience in the investigation of allegations of sexual assault and had previously expressed a bias in favor of alleged victims.  On information and belief, the investigator never worked as a prosecutor or law enforcement officer.

b.  The investigative report contains a number of mis-statements of fact, including but not limited to a claim that John Doe failed to avail himself of an opportunity to request corrections to the report.  John Doe was never told by the College that he should review and suggest corrections to the final report.

c.  The investigator interviewed witnesses suggested by John Doe for incorrect dates.  The investigator thought that the witnesses had failed to back up statements of John Doe about who he left a party with when, in fact, the investigator had asked about a party on a different date.

d.  The investigator failed to give witnesses an adequate opportunity to review and correct witness statements.  One witness, D.H., was given only a 24 hour window to correct a statement and failed to see the communication making this request.  As a result, the investigative report contained false and misleading information from this witness.

e.  The investigator failed to adequately consider that the Complainant had significantly changed her story.

f.  The investigator failed to inquire about the accommodations received by the Complainant even though these accommodations would have had a significant effect on her credibility.

g.  The investigator failed to inquire about the psychiatric medications prescribed for the Complainant, including whether the Complainant was compliant with her doctor's recommendations on the night of the alleged incident or during the investigative period.

h.  The investigator took statements of John Doe out of context or quoted them inaccurately.  For example, the investigator claimed that John Doe said that the Complainant "seemed like she wanted to have sex" when he also said that the Complainant seemed to be enjoying kissing John Doe.  Clifford gave him a nasty look and said chastising, "But she said no!"  John Doe started to explain what he meant but Clifford changed the subject.  The investigator also omitted John Doe's immediate and spontaneous denial of the allegations.  After first learning of the Complainant's story, John Doe said, "That didn't happen. None of that happened. I don't hurt people.  I've never even been in a fight."

i.  The investigator asked leadings questions of John Doe's witnesses, specifically A.T.

j.  The investigator failed to include John Doe's willingness to take a polygraph.  While polygraphs are not admissible in court, they are a common investigative tool and the willingness of John Doe to take a polygraph would be significant.

82. The conduct of the College in holding a hearing investigation fell below the applicable standard of care and amounted to breaches of the duty of due care.  As described above, the College used a biased process and hearing panel.

83. As a direct and proximate result of the College's negligence, John Doe has suffered severe and substantial damages. These damages include diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

84. The Defendants are liable to John Doe for damages.

## COUNT IV
## (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

85. Plaintiff repeats and incorporates all the allegations of this Complaint, as if fully set forth herein.

86. This Count is asserted against the College.

87. The College and its employees intended to cause John Doe serious emotional distress through the negligent imposition of discipline in violation of John Doe's contractual rights.

88. The College's conduct was extreme and outrageous because it was done to appease the Department of Education in abrogation of the College's educational mission, commitment to liberal values, and contractual obligations to John Doe.

89. John Doe has suffered serious emotional distress as a result of the College's conduct.

## COUNT V
## (DEFAMATION)

90. Plaintiff repeats and incorporates all the allegations of this Complaint, as if fully set forth herein.

91. This Count is asserted against the Complainant.

92. The Complainant defamed John Doe by falsely stating that he committed a rape or sexual assault. These statements are defamatory *per se* and also reflected injuriously on John Doe's reputation, exposing him personally to public hatred, contempt, ridicule, shame or disgrace, and affecting John Doe adversely in his future pursuit of his trade, business or profession.

93. The Complainant acted in bad faith in making the false statements about John Doe.

94. The Complainant published, or made, the false statements to various persons at the College, including but not limited to, other students, College staff, and the College hearing panel.

95. As a direct and proximate result of the Complainant's defamatory statements, John Doe has suffered severe and substantial damages. These damages include diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of

35

reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

## COUNT VI
### (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

96. Plaintiff repeats and incorporates all the allegations of this Complaint, as if fully set forth herein.

97. This Count is asserted against the Complainant.

98. The Complainant intended to cause John Doe serious emotional distress through making false allegations against him.

99. The Complainant's conduct was extreme and outrageous because she made false allegations against John Doe, on information and belief, in order to obtain accommodations from the College.

100. John Doe has suffered serious emotional distress as a result of The Complainant's conduct.

*Wherefore*, Plaintiff seeks the following relief from the Court:

- On Counts I-VI, Judgment in favor of John Doe awarding damages in an amount to be determined at trial;
- An Injunction restoring John Doe as a student and prohibiting further disciplinary proceedings in a manner that violates the contract between the parties.
- Court costs and other reasonable expenses incurred in maintaining this action, including reasonable attorney's fees.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury of all issues so triable.

Respectfully submitted,

_____/s/ Joshua Adam Engel_____
Joshua Adam Engel (0075769)
ENGEL AND MARTIN, LLC
5181 Natorp Blvd., Suite 210
Mason, OH 45040
(513) 445-9600
(513) 492-8989 (Fax)
engel@engelandmartin.com

Dated:  May 11, 2016

## CERTIFICATE OF SERVICE

I hereby certify that on May 9, 2016 I served a copy of the foregoing by U.S. Mail to the following:

 Defendant College of Wooster

_____/s/ Joshua Adam Engel_____
Joshua Adam Engel (0075769)